

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-08-403-CV

IN THE INTEREST OF B.B.
AND B.B., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Mother appeals the order terminating her parental rights to Beth and Becca.[2]  In four issues,[3] Mother argues that the evidence is legally and factually insufficient to support the trial court's findings under Texas Family

---

[1] *See* Tex. R. App. P. 47.4.

[2] Pursuant to Texas Rule of Appellate Procedure 9.8(b)(2), we use aliases for the names of the children.

[3] Although Mother lists six issues under her "Issues Presented" section, only four of those issues are briefed.

Code section 161.001(1)(D) and (E), section 161.001(2), and section 161.003.

We will affirm.

## II. FACTUAL BACKGROUND

### A. Mother's Background

Mother grew up in a foster home in New Jersey and completed school through the eleventh grade. In her teen years, mother was diagnosed with bipolar disorder and saw a counselor, but she could not recall exactly when she began taking medication for the disorder.

Mother now has five children, three of whom were not living with her at the time of these proceedings: a grown son, who was raised by his father's cousin; a grown daughter, whose upbringing Mother refused to discuss because the daughter was "a rape child"; and a twelve-year-old son, whose whereabouts and paternity were unknown to Mother. Mother testified that she talks to her grown children every day, but she was evasive about where they live.[4] None of these children are involved in the current proceeding.

The two children at issue are Mother's two youngest children, Beth — who was born January 27, 1994 — and Becca, who was born April 5, 1995. B.F. is

---

[4] Lazane Wall, who saw Beth and Becca for counseling, said that she was concerned about how secretive Mother was when asked questions at trial about her older children. Wall said that Mother did not seem like someone who wanted her children back.

the father of both girls, but he had not seen them since Beth was a year old and Becca was four months old. Mother was never legally married to B.F.

At the time of trial, Mother was married to H.G. but had filed a petition for divorce from him. Mother testified that she was not currently in a relationship.

**B.     Referrals in New Jersey**

**1.     According to CPS's Records**

Melinda Hawkins, a CPS investigator, found out through her conversation with the girls that there had been prior CPS cases against Mother in New Jersey involving both the grown children and Beth and Becca. The record that Hawkins reviewed revealed that there had been multiple CPS cases in New Jersey and that they all involved domestic violence, drug use, or both.

In 1988, Mother dropped off her then two-month-old daughter at an agency office in New Jersey, but no other information was available.

In 1990, New Jersey CPS received a referral involving Mother's son, who was six months old at the time. The father (who is not the same father of Beth and Becca) pushed Mother, and the baby hit his head on a wall. Mother went to a women's shelter after that incident.

In 1991, New Jersey CPS received a referral that Mother was not in a stable condition to take care of the children and that she was in need of mental

health services. The file mentioned that this referral occurred after "an accident" but did not contain information on the type of accident.

In April 2001, New Jersey CPS received a referral that Mother was living at the Rescue Mission, that she had been out all day and had failed to return, and that the children were at the shelter.

In September 2001, New Jersey CPS received a referral that Mother had contacted Rescue Mission because she was locked out of her house and could not find Beth and Becca. The referral stated that Mother had been missing for a few days prior to that and that the girls were living with a family friend.

In May 2006, New Jersey CPS received a referral that Beth had lost her keys and was fearful that she was going to get a beating when she returned home. The concerns of domestic violence were not substantiated at that time.

In November 2006, New Jersey CPS received a referral that the girls had run away due to domestic violence and that they had been staying with a family friend for a month. During the month that the girls were gone, Mother did not call to check on the girls' welfare, and when the girls tried to call Mother, she did not answer. The girls were thereafter removed from Mother's

4

custody;[5] New Jersey CPS was concerned because the girls had found a crack pipe in the home and because of Mother's mental health situation.

### 2.    Mother's Side of the Story

Mother recalled that there were "quite a few unfounded allegations" of physical abuse by Mother toward Beth in 2006 in New Jersey.  Mother described an event when Beth gagged herself at the Atlantic City Shelter; Mother said that Beth was not trying to kill herself but was merely trying to get some attention because she was frustrated at the way she was being treated by the other girls.  Mother said that Beth got her attention, but Mother did not take Beth to the doctor because she was not hurt.

Mother testified that her daughters came into foster care in New Jersey because "there was some domestic violence and some drug abuse."  Mother said that her husband, H.G., was the person committing the domestic violence, that he hit her with his hand, and that she asked him to leave, "but, you know, just as [with] everything, people change."[6]  Mother testified that "there were quite a few instances where the police were called" and that she sought a

---

[5] Prior to November 2006, none of the referrals were substantiated, so the children were not removed from Mother.

[6] Mother did not recall that at one point in New Jersey, H.G. had thrown a glass container at her and missed, hitting one of her daughters and cutting her.  Mother also did not recall Becca ever telling her that she was fearful that H.G. would kill Mother.

5

temporary restraining order against H.G. a couple of times, but she did not recollect whether she followed through and obtained a permanent restraining order against him. Mother said that her daughters were scared about the violence in the home between Mother and H.G. In November 2006, for her daughters' safety, Mother placed the girls with a friend until the domestic violence issue could be resolved.

Mother said that she relapsed on cocaine in 2006, after having been clean for five years, and that her children were removed as a result of her cocaine use. Mother blamed her relapse on poor decisions. While her daughters were in foster care in New Jersey, Mother lived in Philadelphia in a sober house.

Mother's services in the New Jersey case included attending counseling and mental health programs, staying clean, and attending required meetings. During that time, however, Mother was not visiting her children because she was living in Pennsylvania and the girls were living in New Jersey. Mother worked her service plan in the New Jersey case, and her daughters were returned to her.

When the girls were returned to Mother, her understanding was that New Jersey CPS was supposed to contact Texas CPS and that together, over six months, the two agencies would work with Mother to help make her transition smooth. Mother, however, was not contacted by anyone from Texas CPS

when she moved here, so she attempted to seek services and assistance on her own.

### C. Referrals in Texas

The first referral came in to Texas CPS regarding the safety and possible neglect of the girls on November 9, 2007, while the girls were living with Mother at an apartment complex in Arlington. The girls were found in the apartment complex at 10:00 p.m., and when law enforcement arrived and questioned the girls, they said that they lived in the Family Life Shelter in Arlington, that Mother was no longer there, and that she was not answering her phone. Hawkins noted the similarity between this referral and the April 2001 referral in New Jersey.

Three days later on November 12, 2007, the shelter requested that Mother complete a drug test, but she refused. Mother was very upset about the investigation; she took the girls and left the shelter.

Another referral came in on November 28, 2007, which was very similar to the November 2006 referral in New Jersey, and which alleged that the girls were at an apartment complex with one of Mother's friends who was unable to care for the girls. Mother had told her friend that she would be gone for a weekend. Two days after Mother left, she called the girls and said that she was coming back to get them, but two weeks had elapsed with no sign of her.

7

Beth became sick and was running out of her bipolar medication,[7] so the friend could no longer keep the girls.

Hawkins discovered that Beth had only two or three pills of her bipolar medication left and that she also had a cough. Hawkins said that because they could not contact Mother, they did not know how to refill Beth's medicine, which had been prescribed by a doctor in New Jersey.[8]

Hawkins testified that when the referral came in to Texas CPS, the caseworkers were concerned about the situation that the girls might be in by living in Mother's apartment because it did not have adequate furniture and there was no heat. There were also domestic violence concerns, stemming from H.G.'s living with Mother.

## D. Removal in Texas

### 1. According to CPS's Records

The day that Hawkins removed the girls—November 28, 2007—she tried to locate Mother. The girls told her that Mother "hung out" at a friend's house. When CPS went to the house to look for Mother, the occupants said that they

---

[7] Mother testified that Beth was diagnosed as bipolar when she was thirteen and that she takes Seroquel.

[8] Hawkins called the phone number on Beth's bottle of medication, and the pharmacist provided the phone number for Beth's doctor. They left a message for the doctor, but Hawkins does not know what happened after that.

had not seen her in a couple of weeks.  Hawkins kept trying to call Mother's cell phone number, but there was no answer.  Hawkins also called the jails and shelters in Tarrant County but was not successful in locating Mother.

During the car ride to the foster home, Beth kept calling Mother's phone, and it kept saying that the voice mail was full.  The girls were upset, but Beth made the comment, "I can't believe that she did this again."  Hawkins thought that the girls seemed used to Mother's behavior.

Hawkins disposed of the case as "Reason To Believe for Neglectful Supervision."  Hawkins said that CPS was concerned about Beth almost running out of her medicine but that CPS could not add that to the removal allegations because at the time, they were not able to talk to Mother to determine whether this was intentional.  Hawkins testified that after hearing Mother's testimony at trial, CPS would have substantiated the medical neglect as well because Beth needed the medicine and did not have it for whatever reason.

### 2. Mother's Side of the Story

Mother said that she and the girls moved to Texas to get away from what was going on in Pennsylvania and New Jersey.  When they came to Texas, Beth had only a week's worth of medication, but she did not run out of her medications while she was in Mother's care.

9

Mother said that she was not in a position to prevent CPS from taking her daughters into custody when they were removed in late November 2007. Mother explained that she left her daughters with a neighbor so that they could attend the same school while Mother "was trying to make some decisions on what [she] was going to do for their stability." Mother left her daughters with her neighbor, even though she did not know the neighbor that well, because her daughters were friends with the neighbor's children. Mother gave the neighbor a cell phone number where she could be reached.

In December, Mother made contact with the neighbor with whom she had left the girls and learned that the neighbor had called CPS after two weeks of caring for the girls and that the girls were in CPS care in Tarrant County. Mother thinks that two months elapsed before she made contact with her daughters after they were taken into CPS's custody. Mother said that her cell phone did not work during the entire time that the girls were taken into CPS's care, and there was no alternate number for them to use to contact her. Mother agreed that by her leaving the girls and not returning, CPS had grounds to take the girls into custody.

### E. Mother's Service Plan and Compliance Therewith

Katrina White, the ongoing caseworker for Beth and Becca, received the case in late January 2008 and met with Mother to work out a new service plan

because the initial plan was written before CPS knew where Mother was living.[9]

Mother's service plan included (1) weekly visitation with her daughters and required Mother (2) to attend individual counseling and to abide by the recommendations of the counselors, (3) to complete a psychological evaluation, (4) to submit to random drug testing, (5) to attend parenting classes, (6) to provide a safe, stable, and appropriate home, (7) to become gainfully employed, and (8) to continue with MHMR and to follow its recommendations. White also told Mother that it would be good for her to attend Narcotics Anonymous (NA) meetings.

### 1. Visits

White scheduled visits around when it was convenient for Mother to attend,[10] yet during the nine and a half months that the case was pending, Mother made only twelve visits. When Mother attended the visits, she almost always brought lots of clothing for the girls. White did not have any concern

---

[9] White testified that from the time the girls were removed in late November 2007 until the time White received the case in late January 2008, Mother did not communicate with anyone at CPS or with her daughters.

[10] Mother told White that she was working at Motorola early in the case, and so CPS scheduled visits around Mother's work schedule. It was a surprise to White when she heard Mother testify at trial that she had worked only one day during the case.

over the visits on February 14, February 21, March 13, March 18, and March 27.

Mother missed a visit on April 24 and called White on April 30 asking to reschedule. Mother said that she was no longer living in the apartment but was living in a women's shelter after suffering domestic abuse inflicted by H.G. White rescheduled the visit for May 2, but Mother failed to show up. White did not hear from Mother after the April 30 call until June 17, and Mother did not visit from March 28 until June 30. During the time when Mother was in and out of the picture and then called White, she would say that she did not want to disappoint the girls, but White did not recall Mother's asking how the girls were doing.

White observed the visits because Mother had a problem with the two case aides and asked that White be the one to supervise the visits after that. White testified that not all the visits had been happy. There were a couple of visits when Beth ended up in tears because Mother was not paying attention to her.

During the visit one week before trial, Mother was very upset and agitated and confronted White about some things the girls had said. White testified that the girls had taken something out of context that White had told them or had misunderstood what White had said and conveyed that to their

12

Mother. White explained to Mother what White had actually said to the girls. Later, Mother started telling the girls things that White did not feel were appropriate for the visit, and White asked her not to talk about those things during the visit. Mother proceeded to argue with White, and White told her to stop arguing or she would have to end the visit. Mother persisted, and White ended the visit. During this time, White "was a little concerned" about being around Mother during her time of heightened emotion.

According to Mother, she visited her daughters every time she could possibly visit; when she missed a visit, it was because she had moved to a shelter and did not have transportation. Mother said that her visit the week before trial went well as between her and the children but that White "didn't seem to like that I . . . upset[] my children with some information that was shared with them, and she wanted to end the visit." Mother explained that White was approximately thirty or forty minutes late to the visit and that this caused tension. Mother said that the girls were upset about a lot of things that were being said to them during transportation to and from the visits, and they were visibly upset. So Mother inquired why "certain things were being shared" with the girls because it was upsetting them. Mother guessed that White did not feel like Mother should be questioning anything and told Mother that she

13

could stop the visits if Mother wanted to argue. Mother did not feel like she was arguing but rather making an inquiry.

### 2. Individual Counseling

Mother attended seven individual counseling sessions at Positive Influences but stopped going at the end of April because she moved to a shelter. Mother therefore did not successfully complete the individual counseling that was required by her service plan. White said that she thinks Mother still needs counseling.

### 3. Psychological Evaluation

Mother completed a psychological evaluation with Dr. Mark Matthews but did not receive a copy of it and was not aware of the recommendations made in conjunction with the psychological evaluation.[11]

### 4. Drug Testing and NA

White testified that she told Mother where to go to take the hair follicle test, explained that CPS would pay for all the services, and gave her a deadline for taking the test, but that Mother did not ever submit a hair follicle sample.

---

[11] Mother recalled sitting in Dr. Matthews's office, but she did not recall telling him that she had been hospitalized four or five times for psychiatric treatment, that she had been hearing and seeing things, that she had been arrested before, that she believed that there were cameras in her house, or that she believed that people were following her.

White also asked Mother to complete a urinalysis, but she did not.[12]  Mother did, however, supply White with the results of a drug test that she had done at MHMR in March 2008.  Mother went for a drug assessment and did not have a positive drug test, so she was not admitted into the CATS program.  And although White had asked Mother to provide evidence verifying each NA meeting that she attended with a signature from someone who facilitates the meeting, Mother offered only a piece of NA stationery.

During Mother's testimony at trial, she said that she was never asked to submit a urinalysis and that the hair follicle test was never set up.  Mother admitted that the longest she had gone without using cocaine is five or six years and that the last time she used cocaine "was earlier this year."[13]  However, Mother stated that she was now drug-free.  She had been a member of NA for ten years, had been through the steps and was back on step one, had a sponsor, and had attended up to two meetings a day.

### 5.    Parenting Classes

Mother completed parenting classes and anger management classes.

---

[12] CPS considers test results to be positive if a parent does not take a requested drug test.

[13] The trial took place on September 9 and 12 and October 2, 2008.

### 6. Safe, Stable, and Appropriate Home

White said that Mother has had periods of stable housing and periods of unstable housing throughout the case. White said that Mother had lived on Liberty Street, then in a shelter, and at the time of trial was in a two-bedroom apartment off Arkansas Lane that she began leasing five weeks before trial.[14] White visited Mother's apartment and noted that it had adequate furnishings and was clean. White testified, however, that it appeared that Mother was living with H.G. at some point during this case, which concerned White because the girls had said that H.G. was the reason that Mother had started doing drugs again and that he had abused Mother both physically and emotionally.

Mother testified that she lived at four places during the time that CPS had been involved in this case in Tarrant County: an apartment in Arlington; a shelter; a residence on Liberty Street; and, at the time of trial, at an apartment on Arkansas Lane.[15] Mother explained her numerous moves by stating that she moved from the apartments in Arlington because she was trying to do things on her own for her children but ended up losing her job, time, money, and the

_____

[14] Susan Myrosh, the CASA advocate for the girls, testified that Mother had lived five places during this case: an Arlington shelter, a Fort Worth shelter, a house on Liberty Street, an Arlington shelter, and her current address.

[15] Mother testified that H.G. came back and lived with her in an apartment in Texas in February 2008.

16

apartment. Mother said that she went to a shelter and had to leave because there was no availability. Mother spent an extended period of time living in the house on Liberty Street because her church was assisting her until she found something more permanent.

Mother said that during the time that she did not have stable housing, she was working on it. Mother thought the focus on the time frames that she took to get stable should not lead the trial court to conclude that she is "a totally incapable, unstable mother."

### 7. Employment

Mother had never provided her caseworker with a pay stub, proof of employment, or documentation that she is disabled due to her bipolar disorder. However, White had spoken with Ms. Disney, who worked in the MHMR building, and Ms. Disney said that she was taking care of Mother's SSI and disability but did not provide White with any physical documentation.

Mother worked at Motorola for one day while the case was pending, but other than that, she had not worked due to disability. Mother stated that she was in the process of obtaining Social Security disability income and that Dr. Patel with MHMR had signed a medical release stating that Mother's disability deemed her permanently unable to work, but that she had not heard a final decision on her ability to receive disability income. Mother said that if the SSDI

17

was not approved, she would "just work [her] way back towards gainful employment" so that she could provide for herself and her daughters.

With regard to providing financially for the girls' physical needs, Mother said that she would be able to provide food because she was receiving food stamps, that she would be able to provide clothing because there are resources in the community that provide clothing, and that she had already begun the process of getting school supplies for her daughters from the Arlington Life Shelter. When asked whether she had transportation, she said that she did not personally have transportation but was centrally located and was only ten minutes from school and the doctors' offices.

### 8. MHMR

White said that other than the one time after the continuation hearing, Mother had always been very pleasant to her, so White had never had a reason to believe that Mother was not taking her bipolar medications. White, however, admitted that she did not have any knowledge that Mother was taking her bipolar medications and expressed concern that Mother was not taking anything for her paranoid schizophrenia.

Mother admitted that she had been diagnosed with bipolar disorder and said that she was taking her medications daily. Mother was not aware that she had been diagnosed as paranoid schizophrenic and said that she was not taking

18

any medication for that diagnosis. Mother said that regardless of the diagnosis Dr. Patel gave her, she was taking the medications he gave her and would follow up with MHMR. Mother, however, admitted that she missed four appointments with Dr. Patel because he was in Fort Worth and that there is no bus route from Arlington.

### 9. Overall

White testified that overall, Mother was cooperative and appeared to want to work her service plan. Every time Mother talked to White, she asked what she had left to do on her service plan and always gave White some way to get in touch with her.[16] White, however, had numerous concerns.

White said that there was certainly a concern that if Mother got the girls back, she would return to H.G. in the future and expose the girls to more domestic violence. White testified that Mother had used cocaine since she moved to Texas, and the fact that Mother had failed to remain drug-free is a risk to the girls because Mother's use of cocaine would impair her supervision and decision-making abilities. Mother had the whole case to obtain housing but failed to do so until August 1, approximately five weeks before the termination trial; White said that this concerned her because it was not enough time to

---

[16] Despite having contact information, neither White nor Myrosh found Mother to be very forthcoming with information during the course of the case.

show stability. White also had concerns about returning the girls to Mother if she was not taking medication for a mental illness because the medication stabilizes the person's moods and actions, and without stable moods, the person would not be able to care for her children as effectively.

White admitted that she took it upon herself to transport Mother to the majority of the visits because White wanted to award Mother all the opportunities possible to make the visits. White believed that Mother had ample opportunity to work the service plan but that she had not made any significant changes in her life to regain custody of her daughters. White said that even if Mother had finished counseling, she would not have done everything on her plan, except obtain a job, because White did not feel like Mother had proven that she could be stable. In White's opinion, Mother had demonstrated an inability to provide a safe environment for her daughters throughout the New Jersey case and the Texas case involving CPS. White did not believe that Mother would provide a safe and secure environment for her daughters if the court returned them to her, nor did White believe that Mother would be able to care for, nurture, and guide her daughters if CPS ended its involvement in their lives. White concluded that during the nine and a half months that the case had been pending, Mother had not shown that she had established stable housing, stable employment, or emotional stability.

20

When asked what changes she had made, Mother said that she had obtained stable housing, was drug-free, attended and diligently worked a recovery program, was compliant with her doctor appointments and medication, and was working on obtaining disability pay. Mother said that she stayed in touch with her caseworker to the best of her ability during the entire case and that she performed to the best of her ability the services that were asked of her.

### F.     The Effects of Mother's Behavior on the Girls

#### 1.     According to the CASA Advocate

Myrosh, the CASA advocate, became involved with the case in February 2008. Myrosh said that both girls are in the same grade and had recently completed and passed the seventh grade prior to the start of trial. Myrosh described the girls as confused, hurt, and angry and said that they have a lot of conflicting emotions.

When Myrosh first met Beth, she was always getting in trouble at school and being placed on suspension or detention, she was not doing well in her schoolwork, and she had a bad attitude. Two or three months later when Myrosh met with Beth's teachers, they commented that Beth had changed and was getting along with her peers, making friends, doing her schoolwork, asking for extra credit to raise her grades, and becoming more involved in what she

21

was supposed to be doing at school.[17]  The teacher noted that peace had come to the classroom because Beth was no longer acting as the ringleader and perpetuating a hostile environment in the classroom.

Becca had also been in detention and had been suspended at times but had improved.  She had raised her grades and was treating her sister and other students in the classroom better.

Myrosh observed four visits between Mother and her daughters.  On one visit, Myrosh observed Beth crying because Becca was picking on her, and Mother encouraged Beth to toughen up.

During another visit that Myrosh observed, Mother felt that there were some racial issues with the case aide and requested that a new case aide be assigned.  Myrosh had observed the case aide in the visits and found her to be a very strict rule-enforcer, which Myrosh thought was appropriate for the visits.  Myrosh, however, thought it was inappropriate for Mother to be talking about this issue in front of her daughters and asked if it could be discussed privately, but Mother said that they share everything and that it was okay for the girls to be there.

---

[17] During this time, visits were not taking place.

When asked whether there were any other times that she observed Mother talking to the girls about something that she thought was inappropriate to talk about in front of them, Myrosh said that Mother discussed this case with her daughters and with the caseworker (while her daughters were present) and that there was

> this air of keeping secrets with the girls, talking with or just making like snide remarks or rolling the eyes if a case aide or the caseworker said something, or just basically not making the environment to be a -- to be one that is showing total support of trying to work on the goals. Not necessarily work on the goals, but work on keeping peace and just having things run smooth during the visit.

Myrosh said that there had been a couple of times when the girls went for a visit and their mother did not show up, as well as times when the caseworker did not come to the school to pick up the girls because she knew Mother had not shown up. The longest period of time that Mother went without visiting was six weeks. Myrosh said that this occurred during the last couple of months before trial and that Mother had just returned to visiting during the weeks preceding trial.

During those times when visits were not taking place, Beth would call Myrosh and want to know where her mother was because she had been counting on a visit that day. The girls also disclosed to Myrosh their frustration about their mother not showing up at visits. Myrosh said that Beth had told

23

her, "I guess she [Mother] really doesn't want us," and Becca had asked, "If Mom comes around again, what state are we going to live in this time?" Myrosh said that at that point, the girls were no longer frustrated but were resigned to the fact that "this is how it is" so "[l]et's move on."[18]

Myrosh noted that when Mother came to the visits, the girls would be excited but would come back angry. When Mother took breaks from visiting, the girls started acting up more at school and were angry with everyone that came into their path. For the first couple of weeks when Mother stopped visiting, the girls voiced their hurt, but then after they got used to it, they made a complete turnaround and were open, compliant, and obedient. When Mother reappeared, the cycle started over again.

Myrosh believed the girls had come to the realization that Mother is never going to be stable. The girls wanted things to go well for their mother, but the girls were scared. Specifically, Beth was fearful of the abuse that she received from Mother and stepfather, which involved holding her down and hitting her, and both girls were afraid of the "going in and out constantly."

---

[18] When the girls were in foster care in New Jersey, Mother was gone for the whole summer. The girls said that this is the way it had always been; once their mother got "a guy in her life," then she was out of the picture for a couple of months.

24

Myrosh also visited the girls' foster home between four and seven times during the case. In the beginning, Beth ate food out of the trash because she had no manners, talked rudely about people, and failed to show respect for other individuals. Myrosh said that Beth's disrespect was not as strong as it was in the beginning and that her foster dad had worked with her on her manners. Myrosh testified that the foster family had worked with the girls on their behavior; had provided the girls with boundaries and stability, sufficient food, and proper clothing; and had taken the girls to counseling during the time that they had housed them.

### 2. According to the Caseworker

White testified that Becca never seemed to want to talk about the removal in New Jersey and that Beth would "get very convoluted" when she talked about it, so White never obtained a good explanation for what happened. Becca told White that H.G. was the reason Mother started doing drugs again and that he was the reason the girls would leave the home because he engaged in domestic violence.

White testified that both girls were better off psychologically and emotionally than they were in the beginning. Their hygiene was much better, they were no longer eating from the trash, they got along much better with everybody, and Becca had calmed down and was not lashing out at everybody.

25

White said that although the girls seemed more relaxed and a lot happier when Mother was not visiting, the girls loved their Mother a lot and had tried to protect her throughout this case. White did not think that the girls would ever lose hope that Mother would turn her life around but testified that a continued hope of Mother being in the picture could adversely affect Beth and Becca.

White testified that she had been to the foster parents' home ten times and felt that the foster parents had adequately provided for Beth's medical care in terms of her bipolar disorder. White said that the girls called their foster home their "home," that they got along well with the foster family, and that they really liked being in the foster home, but the girls had a hard time trusting people and were scared to make another parental bond with someone else.

### 3. According to the Girls' Counselor

Lazane Walls testified that she had been counseling the girls every other week since February 2007 and was still counseling them at the time of trial. When Walls first started counseling the girls, they said that they had moved to Texas from New Jersey and that they had lived with relatives (without Mother) in North or South Carolina before that. The girls shut down emotionally when Walls asked them how they ended up in foster care and would only say that they were left with a friend of Mother's.

26

Walls knew that Mother was lying when she said that she had visited her girls every week that they had been in CPS custody because there were two or three times when the girls were really depressed because Mother did not come for the visit or call to cancel. Beth was devastated when Mother did not appear for visits. And Becca said that she considered Mother dead because she had not been there for her.[19] The girls loved Mother and cared deeply about her but knew that she did not have the capability—due to her mental health issues and past drug abuse—to be a responsible parent for them. As of the time of trial, Walls testified that the girls were exhausted with inconsistency: no-shows for the visits and no calls.

Wall believed that the girls had trust issues and said that children need stability because they need to know how to trust. In this case, Beth was frustrated with Mother's behavior and wanted to give her another chance. Beth had difficulty accepting that Mother is incapable of taking care of them. Becca did not want to be abandoned anymore and did not want to go back to Mother. The girls said that they were tired of moving around and that they wanted to be in a stable environment.

---

[19] The girls said that Mother had a boyfriend and that whenever she dated, they "became somewhat abandoned."

Walls testified that the girls had realized that they were not going home. They had accepted that they were okay in the current foster placement and had expressed that they really felt good about their foster home because someone was always there when they needed something. Wall said that the foster home provided appropriate boundaries and stability for the girls and had a point system for doing tasks.

### G.     Plans for the Future

#### 1.     Mother

Mother's plan was to continue working on her sobriety by attending NA meetings and working with her sponsor. Mother also said that she had a plan in place to stay away from family violence, but she did not elaborate on what the plan was.

Mother said that the girls would turn eighteen in only a few years and that it would not be in their best interest to tear them away from her because Mother was close to her daughters and had a good relationship with them despite all the things that they had been through. Mother felt "like the kids [had] been under a lot of stress, and, you know, told a lot of things and so forth of their desires, and what they share[d] with [her] versus, you know, what other people, you know, portray[ed] how they feel [are] two different things." Mother testified that the girls wanted to visit with her and that they wanted to

28

come home with her. Thus, Mother testified that she was in a position to care for the girls,[20] that she did not want her parental rights terminated, and that it was not in the girls' best interest to terminate her parental rights.

### 2. The Girls

Myrosh and White testified that the girls initially wanted to go back to their foster home in New Jersey, but now that they had built relationships and friendships in Texas, they wanted to stay with their current foster family. Myrosh testified that the girls had voiced that they wanted to move forward, so their plan was to stay in foster care, go through the PAL Program, and go to college. The girls, however, had always told Mother that they wanted to come home and were excited about coming home. Myrosh also said that Beth did not want to hurt Mother's feelings because Beth cared for her but that Beth did not want to live with Mother. Myrosh believed that the girls were reluctantly agreeing to stay in foster care because that was what they believed that others wanted them to say.

The girls told Walls and White that they wanted stability but that they did not want to be adopted. The girls told White that they wanted to have some

---

[20] Beth told White that Becca had told her that Mother wanted Becca to "be okay" with H.G. living in the home so that the girls could come home to her and H.G.

29

contact with Mother, and Beth told Walls that when she turns eighteen, she wants to help Mother.

### 3. CASA

Myrosh did not believe that Mother had accepted appropriate responsibility for the situation her girls were in, nor did she think that if the girls were placed back with Mother that they would have a safe and secure environment that would appropriately enhance their physical and emotional needs. Instead, Myrosh was concerned for the girls' safety due to Mother's pattern of coming in and out of their lives and believed that continued contact with Mother would put the girls in an emotional upheaval. Myrosh therefore believed that Mother's parental rights should be terminated because when Mother is in the picture, the girls are angry, and when she is not, they relax and start looking toward the future.

### 4. Counselor

Walls believed that the girls should stay at their current foster home because the home had been stable for them. They loved their school, their foster parents, and the environment. They realized that they would go to school, come home, and still be living in the same place the next day, which is stability that they had not previously enjoyed. But because Beth told Walls that she would be devastated if she could not have visits with Mother, Walls

suggested that the trial court allow Mother monthly visits if she could commit to keeping them but noted that sporadic visits would be devastating to the girls. Walls said that so long as Mother (1) demonstrated that she was able to visit with her daughters on a continual basis or to call when she could not be there, (2) stayed drug-free, and (3) followed her doctor's recommendations for taking her medications, Walls believed that Mother's parental rights should not be terminated. However, Walls testified that the girls needed closure and that termination of Mother's rights would be best if she could not demonstrate consistency.

### 5. CPS

White believed that Beth and Becca needed closure. White did not have any concerns about the foster home and believed that the foster parents loved the girls and were willing to take care of their physical, emotional, mental, and spiritual needs now and through adulthood. White therefore believed it would be in the girls' best interest to keep them with their foster parents and to terminate the parental rights of Mother.

### H. Trial Court's Disposition

After hearing the above evidence and reviewing Mother's MHMR records that were admitted into evidence, the trial court found that it was in the best interest to terminate Mother's parental rights to her daughters. The trial court

31

thereafter signed a judgment terminating Mother's parental rights after finding by clear and convincing evidence that Mother had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children and engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; that Mother has a mental or emotional illness or a mental deficiency that renders her unable to provide for the physical, emotional, and mental needs of the children and that the illness, in all reasonable probability, would continue to render Mother unable to provide for the children's needs until their eighteenth birthdays; and that termination of the parent-child relationship with Mother was in the children's best interest. This appeal followed.

### III. Burden of Proof and Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute, and just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential

32

that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, TDFPS seeks not just to limit parental rights but to erase them permanently — to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App. — Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon 2008); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear

33

and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated section 161.001(1)(D) or (E) and that the termination of the parent-child relationship would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### IV. CONDUCT AND ENVIRONMENTAL ENDANGERMENT

In her first issue, Mother argues that the evidence is legally and factually insufficient to establish the endangerment termination grounds. Specifically,

35

Mother argues that TDFPS failed to prove that Mother engaged in an endangering course of conduct or that Mother allowed the children to live in an endangering environment.

Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection (D), TDFPS had to prove that Mother (1) knowingly (2) placed or allowed her children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D). Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of Mother's conduct, including acts, omissions, or failures to act. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). However, it is not necessary that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from

36

parental misconduct standing alone.  *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children's birth.  *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Stability and permanence are paramount in the upbringing of children. *See In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied).  A factfinder may infer from past conduct endangering the well-being of the children that similar conduct will recur if the children are returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 256, *and C.H.*, 89 S.W.3d at 17.  Drug use and its effect on a parent's life and her ability to parent may establish an endangering course of conduct.  *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ).

The record contains substantial evidence of subsection (D) environmental endangerment and subsection (E) course of conduct endangerment to the physical or emotional well-being of the children.  Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it.  *See J.T.G.*, 121 S.W.3d at 126.

37

The record demonstrates that Mother had a long history of illegal drug use, dating back to when she was sixteen years old and was offered cocaine. Mother also had a history of disappearing[21] and of relying on others to parent her daughters while she was away. Because of Mother's disappearances, the girls did not experience stability in their home environment; the record revealed that the girls' foster placement might be the longest that they had ever lived in one place. The record also revealed that there were domestic violence issues between Mother and H.G., which the girls witnessed, and that Beth was fearful of the abuse that she had received from Mother and her stepfather, which involved holding her down and hitting her.

We have carefully reviewed the entire record. Giving due deference to the trial court's findings, we hold that a reasonable trier of fact could have formed a firm belief or conviction that Mother knowingly placed Beth and Becca in conditions and engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *J.F.C.*, 96 S.W.3d at 265–66; *C.H.*, 89 S.W.3d at 25; *J.T.G.*, 121 S.W.3d at 124.

---

[21] In addition to the evidence set forth above, the trial court took judicial notice that a status review was held on February 6, 2008, and that a permanency review was held on June 25, 2008, and that Mother had been gone two months prior to those two hearings.

Although Mother loved the children and had made some effort to comply with her service plan, the record reflects her ability to refrain from drugs was short-term and that when she was abusing drugs, dating, or both, she could not provide a safe and stable environment for the children. *See In re J.C.J.,* No. 05-05-01555-CV, 2006 WL 2348987, at *7 (Tex. App.—Dallas Aug. 15, 2006, no pet.) (mem. op.) (holding that evidence was legally and factually sufficient to show that father engaged in conduct that endangered his children's well-being by not staying off drugs, by not staying on his medications, and by not providing a safe and stable environment for the children); *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that record contained legally and factually sufficient evidence of both endangerment grounds when, among other things, it showed that mother exposed children to domestic violence and refused to participate in her CPS service plan). Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's findings on environmental endangerment and course of conduct endangerment. We overrule Mother's first issue.[22]

_____

[22] Texas law provides that parental rights may properly be terminated when a trial court has made a finding under either section 161.001(1) or section 161.003, plus a best interest finding under section 161.001(2). *See In re W.E.C.*, 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.). Because we have held that termination was proper under section 161.001(1)(D) and (E), we need not address Mother's second and third issues in which she

39

## V. Termination of Mother's Parental Rights Was In The Children's Best Interest

In her fourth issue, Mother challenges the legal and factual sufficiency of the evidence to support the finding that the termination of her parental rights to Beth and Becca was in their best interest.

### A. Standard of Review for Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

challenges the trial court's termination of her parental rights based on grounds listed under section 161.003. *See* Tex. R. App. P. 47.1.

40

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;
>
> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
>
> (C) guidance and supervision consistent with the child's safety;

41

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when

42

appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B.    Best Interest Analysis

Because Mother claims that no legally and factually sufficient evidence exists to establish that termination of her parental rights is in the children's best interest, we begin our analysis with the factors listed in family code section 263.307(b).

With regard to the first statutory factor, the children involved were thirteen and fourteen at the time of trial. Beth had been diagnosed with bipolar disorder, and Becca had been diagnosed with ADHD and required medication to stabilize her mood.[23]

Under the second factor, the record revealed that CPS was able to place Beth and Becca in the same foster home; the girls were never moved to another foster home or returned to Mother after they were removed from her in Texas. The record contains evidence that the girls had previously lived in a foster home

---

[23] Becca was diagnosed with ADHD while in CPS care.

in New Jersey but were returned to Mother after she completed her New Jersey service plan.

With regard to the third, fourth, and ninth factors, the girls were exposed to domestic violence incidents involving Mother and the girls' stepfather, H.G. The girls were also harmed by Mother's numerous disappearances, both before and after the removal. The record also revealed that the girls had been exposed to Mother's drug paraphernalia.

With regard to the fifth factor, the record revealed that Beth was fearful of the abuse that she had received from Mother and H.G., which involved holding her down and hitting her, and that both girls were afraid of Mother's "going in and out [of their lives] constantly."

With regard to the sixth factor, the record did not include psychiatric, psychological, or developmental evaluations of the children; however as mentioned above, several people testified that Beth was on medication for bipolar disorder and that Becca was on medication for ADHD and mood stabilization. The record also demonstrated that Mother had been diagnosed with bipolar disorder and that she had a history of "paranoid ideation."

The record was replete with evidence of the seventh and eighth factors. As set forth above, domestic violence was present when H.G. was in the home. Additionally, the record revealed that Mother had used cocaine, alcohol, and

44

marijuana and that her most recent cocaine use was during the same year as the trial.

With regard to the tenth and eleventh factors, Mother did not successfully complete the individual counseling that was required by her service plan. White believed that Mother had ample opportunity to work the service plan but that Mother had not made any significant changes in her life to regain custody of her daughters.

The twelfth factor—whether the child's family demonstrates adequate parenting skills—is hard to quantify because Mother appeared to relegate the parenting of her daughters to neighbors so that she could disappear. Moreover, when Hawkins called the girls' father, he stated that he could not believe that New Jersey CPS "would give a crackhead back her kids" and that Mother "is going to get them kids killed."[24] Additionally, with regard to Mother's ability to provide the girls with a safe home environment, Mother had filed for divorce from H.G. However, Mother's housing situation had been in flux throughout the case, and she admitted that it would be affected again if her disability income was not approved. And though Mother said that one thing she learned

_____

[24] The girls' father said that there had been a drive-by shooting at one of the homes that Mother had lived in and that the girls had been there at the time of the shooting.

45

from her parenting class is how to address her teenage daughters and respond to them as they go through adolescence, the record revealed that Mother had what CPS deemed to be inappropriate discussions with her daughters regarding the case.

Mother testified regarding the final statutory factor that she did not have family members available to take her daughters. White testified that Mother did not have an adequate social support system to help her with her daughters, and Mother's MHMR records revealed that her support system included "few friends."

Regarding the first *Holley* factor, the girls did not testify at trial, but they had expressed their desires to several people who testified at trial. The record revealed that the girls did not want to disappoint Mother and told her that they wanted to live with her, but the girls told others that they wanted to stay with their current foster family in order to have stability.

Regarding the second factor—the children's present and future physical and emotional needs—Beth needed to continue taking medication for bipolar disorder, and Becca needed to continue taking medication for ADHD and mood stabilization. Additionally, both girls spoke of wanting stability, and the record reflected that the girls had not lived in a stable home other than their foster home. The record also demonstrated the girls' need for consistency as

46

Mother's inconsistent visiting pattern sent the girls on an emotional roller coaster, affecting all areas of their lives.

The third and eighth factors—the emotional and physical danger to the children now and in the future and the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one—were at the heart of this case. Myrosh testified that continued contact with Mother would put the girls in an emotional upheaval and that she (Myrosh) was concerned for the girls' safety due to Mother's pattern of coming in and out of their lives. Beth told Myrosh that she would rather not go back to Mother because she is fearful of the abuse she experienced from Mother and H.G. and is fearful of being left again.

Regarding the fourth factor—the parental abilities of the individuals seeking custody—Myrosh testified that the current foster placement provides the girls with a safe and secure environment that appropriately enhances their physical and emotional needs. The record revealed that the foster parents have worked with the girls on their behavior; have provided the girls with appropriate boundaries and stability, sufficient food, and proper clothing; and have taken the girls to counseling during the time that they have housed them.

Concerning the fifth factor, Mother attempted to better herself by attending parenting classes, anger management classes, and NA and by

47

completing her psychological evaluation and drug assessment. However, she failed to consistently visit with the children; to complete her individual counseling sessions; to submit a hair follicle for drug testing; and to establish stable housing, stable employment, and emotional stability.

Regarding the parties' plans for the children—the sixth factor—Mother testified that she was in a position to care for the girls and that it was not in their best interest to tear them away from her. Myrosh believed that Mother's parental rights should be terminated so that the girls could relax and start looking toward the future, and White agreed, stating that it is in the girls' best interest to keep them with their foster parents.

Regarding the stability of the proposed placement—the seventh factor—the evidence demonstrated that terminating Mother's parental rights would allow the girls to remain in their current foster placement—the place where they have lived the longest—which would allow them to have the stability that was lacking when they lived with Mother.

Finally, concerning the ninth factor—any excuse for the parents' acts or omissions—Mother said that she was accountable for the poor decisions that she had made in her life and for how her decisions had affected her children. Although Mother said that she did not appear for any visits during all of May and most of June because she was in a shelter and did not have the resources

48

to travel to the visits, she agreed that it is neglectful for a parent to disappear for a few months and not let the child know where he or she is. Mother admitted that her daughters witnessed domestic violence when they lived with her and that she did not believe it was appropriate for them to witness that. Mother also admitted that Beth and Becca witnessed Mother's drug use and found a crack pipe in the house in New Jersey. Mother said that she had been diagnosed with bipolar disorder and that for the majority of her life, she had depended on the government for assistance. Mother agreed that she had not shown a lot of stability throughout the case but said that was due to her lack of income; however, Mother would not agree that she had a history of abandoning her daughters.

In sum, the record demonstrates that CPS agencies from two states—New Jersey and Texas—had extensive involvement with Mother. Mother's history of drug use and disappearances, difficulty maintaining stable housing, and inappropriate choice for a spouse, which put her children in danger by exposing them to domestic violence, all demonstrate that it was in the children's best interest that Mother's parental rights be terminated. *See* Tex. Fam. Code Ann. § 161.001(2).

Giving due consideration to evidence that the factfinder could have reasonably found to be clear and convincing, and based on our review of the

entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that the termination of Mother's parental rights would be in the children's best interest. *See In re K.A.S.*, 131 S.W.3d 215, 226–30 (Tex. App.—Fort Worth 2004, pet. denied) (holding that evidence was legally and factually sufficient to support best-interest finding because there was domestic violence in home, child had attempted suicide, mother had lengthy history of noncompliance in taking medications for her bipolar disorder and had rages and struck children when noncompliant, oldest child's bipolar disorder and post-traumatic stress disorder would contribute to problems in home, and children were secure in their temporary placements in foster care); *In re M.B.*, No. 02-07-00280-CV, 2008 WL 2930530, at *14 (Tex. App.—Fort Worth July 31, 2008, no pet.) (mem. op.) (holding that evidence was factually sufficient to support jury's finding that termination of appellant's parental rights was in children's best interest because TDFPS had received eight to ten referrals about appellant, appellant had difficulty maintaining safe and stable housing, appellant had an inconsistent employment history with no guaranteed income, and appellant made inappropriate choices by living with a sex offender and engaging in domestic violence). Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. We overrule Mother's fourth issue.

## VI.  CONCLUSION

Having overruled Mother's dispositive first and fourth issues, we affirm the trial court's judgment terminating her parental rights to Beth and Becca.

SUE WALKER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED: May 7, 2009